## WILLIAMS VS. CHEATHAM.

The proof that a bill of sale absolute upon its face, was intended as a mortgage, ought, in the absence of fraud and imposition, to be clear, decisive and without doubt.

*Appeal from the Circuit Court of Hempstead county, in Chancery.*

Hon: THOMAS HUBBARD, Circuit Judge.

S. H. HEMPSTEAD, for the appellant.

WATKINS & GALLAGHER and CUMMINS & GARLAND, for the appellee.

Mr. Justice SCOTT, delivered the opinion of the court.

This was a bill in chancery, filed September 30th, 1854, to redeem two slaves purchased by Cheatham from Williams in December 1851. The money was tendered five days before the filing of the bill. The bill of sale for the negroes was absolute upon its face. Williams alleged, nevertheless, that it was

intended to be a mortgage.    This was fully denied by the an-
swer, which, it may be stated, repels the whole  equity of the
bill, and leaves the  case to be decided upon the testimony, un-
der the rule repeated and applied during the  present  term in
the case of *Spence vs. Dodd*, (which was also a  bill to redeem
a slave) that where  the  facts alleged in the bill are  denied in
the answer, they must be proved  by two credible witnesses, or
by one witness and  strong corroborating circumstances.    And
perhaps in no class of cases ought this rule to  be more strictly
enforced than in  such as these  where solemn instruments of
writing are sought to be varied or  contradicted by parol proof;
and the chancellor called upon to  exercise one  of the highest
and most extraordinary powers vested in  a  Court of equity.—
Certainly in such cases the proof of the parol agreement, in the
absence of fraud and imposition, ought to be clear, decisive and
without doubt: otherwise the title to property,  in no  little  de-
gree, must be precarious and unsafe; especially so in the times
in which we live, when California gold has so rapidly cheapened
the price of money and enhanced the market value of property.
However true it might have been, in the staid old Anglo-Saxon
times, when the chancellor, in a spirit of  pure benevolence, as-
sumed this  jurisdiction, that if the purchaser got  back his mo-
ney and interest, it was no hardship  to him,  even if the chan-
cellor had unwittingly lent too ready an ear to the complaint of
his adversary, it is certainly not true, in  our day, when, as this
Court more than judicially knows,  it requires  fully  double as
much money to buy a negro, or a horse, or to pay a hotel bill, as
it did, when this alleged contract for redemption was made;  to
say nothing  of swamp lands and real estate in general, which,
although subject to the same rule, have  enhanced in  market
value still more.    In times of an  opposite  character such bills
would be  rarely heard of, and when filed would merit the most
willing ear of the chancellor.

    This case differs from that of *Spence vs. Dodd* in this, that is,
in the latter case a single witness proved in every particular the
alleged stipulation for redemption and its terms, distinctly and

clearly; but there was the want of the proof of pregnant circumstances. Here, on the contrary, the witness, who is relied upon for that purpose, speaks of his *understanding* and the *general understanding* as to the matter of redemption, and is indefinite and to a degree uncertain even as to *this understanding* as to what were the *terms* of the alleged redemption; while Walker, another witness, who seemed about as active in advising the sale as this witness, and was present when it was made, testifies that it was his " *impression* that it was *an unconditional sale.*" There is also a want of agreement among the witnesses as to the value of the slaves. This last named witness thinks $1200 was the full value of the slaves, and so does the sheriff, Sandefur, and another witness, while other witnesses think they were worth more money. There is no pretence that Williams ever owed Cheatham any money; nor is there any thing in the testimony to show that Cheatham was a money lender, or offered to loan any money to Williams or any one else, or that there was ever any negotiation set on foot by Williams, or on his behalf, to borrow money from Cheatham. On the contrary, these persons, who interposed in his behalf with their advice in the emergency of his embarrassments, to protect his pecuniary interest and that of the Bank, who held a mortgage on all his negroes, do not appear to have suggested a *loan* at all, but a *sale* of two negroes which would satisfy the execution then about to be satisfied out of his plantation stock, which would have put a stop to his plantation operations, and disabled him from making the money, by the labor of the slaves upon the plantation, to pay off the Bank lien. Thus it was that upon the part of the Bank it was proposed to give up this lien, as to the two negroes, in case they could be *sold* and the money thus appropriated. This seemed to have been settled upon to a very great extent—perhaps to the full extent, except that Mrs. Williams had not been consulted about it—the day before the sale of the stock was to have been made. On the day of sale, it seems, Cheatham came to the premises to purchase horses, mules, etc., and was informed the sale would not take place, but that

he could buy two negroes—even the price of the negroes seems to have been fixed, or very nearly so, previously to that time. He purchased, and seems to have agreed to give $50 more than this price rather than that Williams, who seemed to think $1200 too little, should suppose that he was taking any advantage of his embarrassment. In the same spirit, no doubt, he gratuitously signified his willingness that the negroes might be redeemed within six or twelve months (as he states in his answer) in order doubtless to minister to Mrs. Williams' natural distress of mind in parting from two girls she had raised in her family from their infancy. But afterwards, when the bill of sale previously signed by Williams, was being executed by Mrs. Williams, Williams said something to Cheatham about redeeming the slaves, and Cheatham saying he would do exactly what he had promised to do, asked Williams " whose loss it would be in case of the *death* of the negroes? " To which Williams replied, *yours!* Then responded Cheatham to that—in substance—" that if he had to take the risk of the negroes the redemption of them of course would be at his own discretion." This circumstance, proven on the part of the complainant below, is a pregnant one to show that there really never was any definite stipulation, as a part of the contract of sale and purchase, *for redemption* even in the six or twelve months, much less for a right to redeem near three years afterwards; but that whatever may have been " understood" as to redemption was indefinite—rested in the benevolence and generosity of Cheatham. It is incredible that Cheatham would have given the full value for the slaves, when he was not particularly seeking to purchase such property at all, take the risk of their lives, allow Williams indefinitely to redeem, if by future events it should be his interest to do so, and if otherwise, to fasten the loss on Cheatham, when there is no testimony to show that the latter had any peculiar interest in the pecuniary welfare of Williams or his family; and when Williams was evidently seeking a sharp bargain in response to Cheatham's generosity, in first adding $50 to the

price, and then ministering to the distress of mind of Mrs. Williams.

The evidence, as far as it goes, tends far more to show a conditional sale, than the alleged mortgage proceeded for.

Under the state of the proofs and the rule of law above cited, by which their force and effect have to be measured, we do not see how the chancellor could have properly done otherwise than dismiss the complainant's bill, as he did.   His decree will be affirmed.

Absent, Mr. Justice Hanly.